## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## WESTERN DIVISION

| | | |
|---|---|---|
| **McComb Children's Clinic, LTD.**, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No.** 5:24-cv-48-KS-LGI |
| | ) | |
| **Xavier Becerra**, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A DELAY OF EFFECTIVE DATE AND FOR PRELIMINARY INJUNCTION

Federal officials seek to make medical clinics perform and promote harmful "gender-transition" procedures that block puberty and remove healthy body parts from children. McComb Children's Clinic, LTD. ("MCC") needs urgent judicial relief from that new rule issued by the U.S. Department of Health and Human Services ("HHS"). Without relief, MCC will lose the ability to continue treating underserved patients in the southwest Mississippi area, because the rule will eject MCC from Medicare, Medicaid, the Children's Health Insurance Program ("CHIP"), and other federally funded health programs. This rule violates the Administrative Procedure Act, federalism, and the First Amendment's Free Speech Clause. Its effective date and enforcement should be enjoined while the Court hears this case.

### BACKGROUND

On May 6, 2024, HHS published a rule deeming it "gender-identity" discrimination when medical caregivers decline to provide or promote harmful "gender-transition" procedures. *See* Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37522 (May 6, 2024). HHS issued this rule purporting to clarify Section 1557 of the Affordable Care Act ("ACA"), which incorporates Title IX

of the Education Amendments of 1972. One week later, MCC challenged the rule under the Administrative Procedure Act, the structural principles of federalism, and the Free Speech Clause of the First Amendment. Compl. *See* Compl. [ECF 1] at ¶¶ 256–323. MCC is a pediatric practice that cares for patients in southwest Mississippi through programs such as Medicaid and CHIP. Artigues Decl. *See* Decl. of Michael Artigues, M.D., F.C.P. [ECF 1-2] at ¶¶ 3, 7, 61 ("Artigues Decl."). MCC provides excellent healthcare to all patients, including patients who identify contrary to their sex. *Id.* ¶¶ 10, 27–28. But the rule extends far beyond ensuring that kids with a cough or cold receive equal, compassionate care.

This new rule turns medicine upside down. Doctors who heal must also hurt. Caregivers committed to science must practice as if the basic biology of their patients is a mere mental construct. Because MCC provides or refers for certain treatments when medically indicated, the rule considers MCC as illegally "discriminating" if it does not also provide or refer kids for the same treatment when its sole purpose is to "transition" kids to the opposite sex — as if that were scientifically possible — setting kids on a life-long trajectory of pain, sorrow, and sterility. 89 Fed. Reg. at 37698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206); Compl. [ECF 1] at ¶¶ 93–96, 163; Artigues Decl. [ECF 1-2] at ¶¶ 25–26.

For example, since MCC refers kids for medication to treat early puberty, it must also refer kids for those hormones to "transition" their gender. Compl. [ECF 1] at ¶¶ 84–86, 163; Artigues Decl. [ECF 1-2] at ¶ 25. Since MCC offers lactation help for new mothers, it must also help men "chestfeed." Compl. [ECF 1] at ¶¶ 113, 169–70; Artigues Decl. [ECF 1-2] at ¶¶ 20–23. MCC must allow males use its "Breastfeeding Moms Only" rooms. 89 Fed. Reg. at 37698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206); *see also* HHS, Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47824, 47866–867 (proposed Aug. 4, 2022); Compl. [ECF 1] at ¶¶ 169–70, 213; Artigues Decl. [ECF 1-2] at ¶¶ 20–21. The rule even purports to

preempt state laws protecting children from gender-reassignment procedures. 89 Fed. Reg. at 37535; Compl. [ECF 1] at ¶¶ 94, 187, 314.

Equally egregious, the rule censors and compels speech. It deems it a "hostile environment" if MCC shares its medical judgment that gender-transition procedures are categorically harmful, experimental, and cosmetic. 89 Fed. Reg. at 37596, 37698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206); Compl. [ECF 1] at ¶¶ 75, 93–96, 98–104. Instead MCC must affirm these efforts and use pronouns contrary to a patient's sex. Compl. [ECF 1] at ¶¶ 106–08, 166–68, 289; Artigues Decl. [ECF 1-2] at ¶¶ 17–18. Under the same provisions, MCC must be willing to say men can become pregnant and give birth. 87 Fed. Reg. 47824, 47865; Compl. [ECF 1] at ¶¶ 109–10.

The rule makes untold numbers of medical caregivers ineligible to help the most needy patients enrolled in Medicare, Medicaid, and CHIP. Compl. [ECF 1] at ¶¶ 4, 130, 135, 194. By July 5, 2024, those caregivers must provide, refer for, and affirm gender-transition procedures within their scope of practice or be disqualified, and must submit assurances to the government that they comply. 89 Fed. Reg. at 37693 (to be codified at 45 C.F.R. § 92.1(b)). MCC must violate and remove its existing policy that categorically opposes providing, referring for, or affirming gender-transition efforts. Compl. [ECF 1] at ¶¶ 119, 208–12; Artigues Decl. [ECF 1-2] at ¶¶ 15, 34–35, 40, 53–54. MCC must instead start referring for gender-transition medical actions, start using patients' purported pronouns, and remove its "Breastfeeding Moms Only" signs so men can use MCC's lactation rooms. 89 Fed. Reg. at 37698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206); Compl. [ECF 1] at ¶¶ 99, 106–08, 206, 213.

Then, within one year, medical caregivers must go further: they must affirmatively adopt, hand out to all patients, and prominently post on their office walls new HHS-approved gender-identity and abortion-nondiscrimination policies, plus they must reeducate all employees to comply with the rule. 89 Fed. Reg. at 37693

3

(to be codified at 45 C.F.R. §§ 92.1(b), 92.8, 92.9). Under these policies, MCC would imply that it would perform, refer for, or affirm gender-transition procedures or elective abortions. This, again, would require repeal of MCC's existing policy. Compl. [ECF 1] at ¶¶ 159, 212; Artigues Decl. [ECF 1-2] at ¶¶ 15, 34–35, 40, 54.

To ensure patients can keep receiving healthcare, MCC seeks a delay of the rule's effective date and a preliminary injunction. About 75% of MCC's patients pay through Medicaid or CHIP — the clinic will not be financially viable if ejected from these programs. Artigues Decl. [ECF 1-2] at ¶¶ 7, 63. Without relief, MCC must harm patients and self-censor, or incur devastating penalties.

## STANDARD FOR GRANTING THE MOTION

Under the Administrative Procedure Act, "to prevent irreparable injury," this Court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705; *see Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021).

A plaintiff seeking a delay or preliminary injunction under § 705 must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the plaintiff will suffer irreparable harm without an injunction; (3) that the threatened injury outweighs any damage that the injunction might cause the defendants; and (4) that the injunction will not disserve the public interest. *All. for Hippocratic Med. v. U.S. Food & Drug Admin.* (*AHM v. FDA*), 78 F.4th 210, 241 (5th Cir. 2023).

# ARGUMENT

## I.  This Court has jurisdiction.

### A.  McComb Children's Clinic has standing as a regulated entity.

MCC has standing to challenge the rule. In a suit challenging government action, if a plaintiff like MCC is the object of such government action, "there is ordinarily little question" that the action or inaction has caused MCC injury and thus MCC has standing. *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (cleaned up). Entities are the object of a regulation when (1) "the regulation is directed at them"; (2) "it requires them to make significant changes in their everyday business practices"; and (3), "if they fail to observe" the regulation, they are "exposed to … sanctions." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153–54 (1967). Each condition is met here.

*First*, the rule directs its requirements to all recipients of federal health programs such as Medicaid and CHIP, and MCC is such an entity. 89 Fed. Reg. at 37694 (to be codified at 45 C.F.R. § 92.4); Compl. [ECF 1] at ¶¶ 46–48, 183–84; Artigues Decl. [ECF 1-2] at ¶ 7. The rule not only imposes nondiscrimination requirements, it imposes procedural requirements that HHS admits will exert a financial burden on clinics like MCC. *See, e.g.,* 89 Fed. Reg. at 37677–85; Compl. [ECF 1] at ¶¶ 218, 220–36.

*Second*, the rule requires significant changes to MCC's everyday medical practices and speech. The rule forces MCC to either: (1) ignore sound medical judgment and applicable state law and comply, with all the burdens associated with compliance; (2) risk liability and devastating penalties; or (3) stop seeing Medicaid and CHIP patients, possibly closing the clinic. Compl. [ECF 1] at ¶ 193.

*Third*, the government's threatened sanctions are strong. MCC will lose eligibility for extensive funding and will risk liability if it fails to comply, exposing it

to investigations and lawsuits. *Id.* ¶¶ 57–66, 138–52. MCC's standing is also bolstered because HHS invites patients to file an administrative complaint against clinics like MCC if they do not comply. *Id.* ¶¶ 64–65 *Cf. Susan B. Anthony List v. Driehaus* (*SBA List*), 573 U.S. 149, 164 (2014).

### B.      The rule threatens serious and imminent injuries-in-fact.

MCC's injuries are moreover "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; its injuries are fairly traceable to the rule; and its injuries are likely to be redressed by relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). The rule admits it imposes financial compliance costs, 89 Fed. Reg. at 37677–85, those costs have already begun, Artigues Decl. [ECF 1-2] at ¶¶ 31–50, and added injuries are more than "fairly likely[.]" *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021). The rule causes these injuries, and the Court must assume its illegality for standing purposes. *FEC v. Cruz*, 596 U.S. 289, 298 (2022). Delaying and enjoining the rule would remedy these injuries and maintain the status quo.

### 1.      The rule causes MCC economic losses.

MCC faces irreparable financial harm from the rule in two forms. *First*, it faces the imminent loss of Medicaid and CHIP reimbursement unless it complies with the rule. Compl. [ECF 1] at ¶¶ 57–66, 138–52. Such "economic injury is a quintessential injury upon which to base standing." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). *Second*, the rule admits that it imposes financial compliance costs. 89 Fed. Reg. at 37677–85. MCC has already spent time preparing for compliance consistent with these estimates, and if judicial relief is not forthcoming it stands to lose even more. Artigues Decl. [ECF 1-2] at ¶¶ 31–50.

Activities the rule estimates will cost MCC, and that will actually cost it, include reading the rule, changing policies, providing notices, preparing and

providing employee training, and keeping records of training and grievances. *Id.* MCC employees will be "forced to divert time and resources away from their regular patients," *AHM v. FDA*, 78 F.4th at 235. Such monetary harms "obvious" concrete harms, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021), and they are particularized because they affect MCC individually, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016).

### 2. The rule removes MCC's state-law protections.

Next, the rule seeks to preempt MCC's "state-created right[s]" not to perform, refer for, or affirm certain gender-transition procedures, which "alone creates Article III injury." *Deanda v. Becerra*, 96 F.4th 750, 753 (5th Cir. 2024). Mississippi has restrictions on gender-transition procedures, laws that protect MCC from having to perform, refer for, or affirm these procedures. Compl. [ECF 1] at ¶¶ 94, 187, 314. Mississippi also protects medical rights of conscience. Miss. Code § 41-107-1 to -13 (2004). But the rule sweeps these state-law rights aside. 89 Fed. Reg. at 37535.

### 3. The rule rewrites MCC's healthcare policies.

What is more, MCC faces injuries from the rule's unlawful "pressure" to act and speak differently in at least five ways. *Texas v. EEOC*, 933 F.3d at 449.

*First*, MCC can no longer publish or follow its policy that it categorically opposes providing, referring for, or affirming gender-transition efforts. 89 Fed. Reg. at 37693 (to be codified at 92 C.F.R. § 92.1(b)); Compl. [ECF 1] at ¶¶ 119, 208–12; Artigues Decl. [ECF 1-2] at ¶¶ 15, 34–35, 40, 54. The clinic must take down this policy or else it will be a lie or a liability. Artigues Decl. [ECF 1-2] at ¶ 42. The rule requires MCC to revise, publish, and train employees on new policies. 89 Fed. Reg. at 37696–98 (to be codified at 45 C.F.R. §§ 92.8, 92.9, 92.10); Compl. [ECF 1] at ¶ 119; Artigues Decl. [ECF 1-2] at ¶¶ 34, 54. By July 5, 2024, MCC must also submit assurances to the government that it complies with this rule. 89 Fed. Reg. at 37696 (to be codified

at 92 C.F.R. § 92.5). When the government compels an American recipient of funds to abandon or adopt a position as a condition of funding, it "violates the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. ("AOSI")*, 570 U.S. 205, 221 (2013).

*Second*, MCC must start referring, for gender-transition, puberty blockers and cross-sex hormones, and lactation training for men, because the clinic refers for these drugs and services for legitimate medical reasons. 89 Fed. Reg. at 37698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206); Compl. [ECF 1] at ¶¶ 84–86, 93–96, 163; Artigues Decl. [ECF 1-2] at ¶¶ 20–21, 25–26. MCC cannot decline to provide these referrals based on its medical judgment that they are categorically harmful. Compl. [ECF 1] at ¶¶ 75, 93–96, 98–104. The rule "force[s MCC] to choose between following" its sound medical judgment "and providing care." *AHM v. FDA*, 78 F.4th at 236.

*Third*, the rule censors MCC from providing its complete medical opinion. 89 Fed. Reg. at 37596, 37698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206); Compl. [ECF 1] at ¶¶ 75, 93–96, 98–105. If patients ask, the rule forces MCC to withhold its true categorical opposition to "gender transitions" and give patients the false impression that such procedures are not harmful, experimental, or cosmetic. *Id*.

*Fourth*, in using a patient's pronouns MCC bases them on their biological and binary reality as a male or female. Artigues Decl. [ECF 1-2] at ¶¶ 17–18. But the rule forces the clinic to use self-selected pronouns contrary to sex according to biology. 89 Fed. Reg. at 37596, 37698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206); Compl. [ECF 1] at ¶¶ 106–108, 166–68, 289.

*Fifth*, MCC provides lactation training and lactation rooms by sex—not by "gender identity." Compl. [ECF 1] at ¶¶ 169–70, 213; Artigues Decl. [ECF 1-2] at ¶¶ 20–21. But the rule requires it treat some males as if they are female, and to remove its "Breastfeeding Moms Only" signs on July 5, 2024, even at the risk to

women's privacy, dignity, and safety. 89 Fed. Reg. at 37698–701 (to be codified at 45 C.F.R. §§ 92.101, 92.206); *see also* 87 Fed. Reg. at 47866.

### C.     MCC's claims may proceed now.

MCC's case is thus ready for decision. HHS's rule is "by definition, a final agency action" subject to review under the APA. *Texas v. EEOC*, 933 F.3d at 441–42, 446. MCC is more than arguably "within the zone of interests" that Congress governed Section 1557 in the ACA, which regulates healthcare entities like MCC. *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) (cleaned up); *see* 42 U.S.C. § 18114. And further factual development would not "significantly advance [the Court's] ability to deal with the legal issues." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (citations omitted).

MCC need not wait for specific enforcement. *Texas v. EEOC*, 933 F.3d at 449. When an entity can "realistically expect[ ]" that its policies "will be perceived by the Department as a violation," it has shown "a sufficiently distinct and palpable injury." *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1118 (D.C. Cir. 2005). MCC intends to engage in speech and activities more than "arguably affected with a constitutional interest," *infra* Pt.II.B–C, and its medical practices will be more than "arguably" proscribed. *SBA List*, 573 U.S. at 159–60. With no exemptions covering MCC, it may bring an "immediate challenge." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376–77 (5th Cir. 2022) (cleaned up).

Indeed, the federal government previously lost its attempt to impose a similar mandate even when it alleged some exemptions might apply, which it does not do for MCC here. *See, e.g.*, *Becerra*, 47 F.4th at 375–76, 379–80 (affirming grant of a permanent injunction against a prior HHS attempt to impose this Section 1557 mandate); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602–06 (8th Cir. 2022) (same); *Christian Emps. All. v. EEOC*, No. 1:21-cv-195, 2024 WL 935591, at *5

(D.N.D. Mar. 4, 2024) (granting similar injunction); *Texas v. EEOC*, No. 2:21-CV-194-Z, at 19–28 (N.D. Tex. May 26, 2022) (same); *Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 1265925, at \*4–6 (N.D. Tex. Apr. 26, 2022) (same); *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 678–79 (N.D. Tex. 2016) (same); *cf. Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 820–28 (E.D. Tenn. 2022) (granting injunction against a prior Title IX gender-identity mandate); *Texas v. United States*, 201 F. Supp. 3d 810, 819–23 (N.D. Tex. 2016) (same). Finally, if the statutes underlying this rule were read to impose similar mandates (they do not), MCC's constitutional claims would still protect it against enforcement.

## II.    MCC has a substantial likelihood of success on the merits.

MCC has a substantial likelihood of success on the merits, for three reasons. *First*, Congress never included gender identity in Section 1557 or Title IX. *Second*, the rule violates the structural principles of federalism. *Third*, the rule coerces expression in violation of the First Amendment.

Under the APA, 5 U.S.C. § 706(2), a rule must be "set aside" when it is "(A) … not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Courts also have constitutional authority to enjoin *ultra vires* agency action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90, 693 (1949).

### A.    The rule lacks statutory authority.

Section 1557 does not address gender identity. It is a healthcare statute that acknowledges sex according to biology, and it is based on a 1972 educational statute that acknowledges sex according to biology.

10

### 1. Title IX prohibits treating one sex worse than the other.

As relevant to this case, section 1557 combines two statutes, and therefore the Court's statutory analysis should consider both: the ACA and Title IX. Section 1557 prohibits discrimination "on the ground prohibited under … title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a).

Title IX is an equal-opportunity law that protects and sometimes requires sex distinctions. 20 U.S.C. § 1681(a). It does not cover gender identity. When Title IX was adopted in 1972, "on the basis of sex" was commonly understood to refer to biological differences between males and females. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022). Sex was considered an "immutable" trait, "determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). Throughout Title IX, Congress used "sex" to denote the male-female biological binary. *Neese v. Becerra*, 640 F. Supp. 3d 668, 684 (N.D. Tex. 2022). For example, Title IX permits schools to go from admitting "only students of one sex" to admitting "students of both sexes." 20 U.S.C. § 1681(a)(2).

Congress spoke similarly in the ACA in 2010. It referenced "sex" in biological binary terms—not gender identity. It overwhelmingly refers to "women" and mothers separately from "men," and seeks to protect "women's unique health care needs." 42 U.S.C. §§ 1315a(b)(2)(B)(i); *see also, e.g.*, 42 U.S.C. §§ 237a, 242s, 280g-12(a)(3)(B), 280k(b)(1), 300gg-13(a)(4), 711, 712 (note), 713(c)(1), 1396d(l)(3)(b)(2) & (bb)(1), 18201–03. For example, the ACA requires the provision of "information to women and health care providers on those areas in which differences *between men and women* exist." 21 U.S.C. § 399b (emphasis added). Reframing "sex" in the ACA to include men *as women* if they so identify negates the words of Congress. HHS cannot do this: "[a]gencies have only those powers given to them by Congress." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022)

Next, to "be subjected to discrimination" under Title IX, 20 U.S.C. § 1681(a), refers to an unjust distinction, or the "failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286 (2011) (cleaned up). Sex discrimination means more than treating males and females differently; it means subjecting someone to "differential" or "less favorable" treatment than similarly situated persons based on their biological status as male or female, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), where "there is no justification for the difference in treatment," *CSX*, 562 U.S. at 287.

Because Title IX applies to "any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a), what constitutes a reasonable distinction between men and women thus depends on whether the sexes are similarly situated in particular contexts, like intimate spaces, specific programs, and athletics. Title IX's well-established purpose was to promote opportunities for women. *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004). That allows and often requires sex distinctions. Statutory text "cannot be divorced from the circumstances existing at the time it was passed" or "from the evil which Congress sought to correct and prevent." *United States v. Champlin Refin. Co.*, 341 U.S. 290, 297 (1951).

## 2. Title IX does not prohibit all sex distinctions.

Because men and women sometimes differ, not all sex distinctions constitute discrimination. That is why Title IX protects and even requires some sex distinctions. Congress said that "nothing contained herein shall be construed to prohibit … separate living facilities for the different sexes." 20 U.S.C. § 1686. This is a rule of construction that shows "sex" refers only to biology, not gender identity. As Senator Birch Bayh (D-IN) explained, "I do not read [Title IX] as requiring integration of

12

dormitories between the sexes, nor do I feel it mandates the desegregation of football fields. What we are trying to do is provide equal access for women and men students. … We are not requiring that intercollegiate football be desegregated, nor that the men's locker room be desegregated." 117 Cong. Rec. S. 30407 (Aug. 6, 1971). This also explains why Title IX exempts "father-son or mother-daughter activities," 20 U.S.C. § 1681(a)(8); fraternities and sororities "limited to persons of one sex," *id.* § 1681(a)(6); and beauty pageants "limited to individuals of one sex only," *id.* § 1681(a)(9). Though fraternities and beauty pageants are not necessary for educational opportunities, Congress protected them anyway, recognizing that single-sex spaces are not necessarily discriminatory.

### 3. Title IX's postenactment history confirms that sex distinctions are sometimes necessary.

Longstanding Title IX regulations also recognize that Title IX allows and sometimes requires sex distinctions. These regulations protect (1) sex-education classes designated by sex, 34 C.F.R. § 106.34(a)(3); (2) comparable, "separate toilet, locker room, and shower facilities on the basis of sex," *id.* § 106.33; (3) separate "physical education classes or activities during participation in … sports," *id.* § 106.34(a)(1); and (4) schools to "sponsor separate [sports] teams for members of each sex," *id.* § 106.41(b). The regulations require schools to provide "equal athletic opportunity for members of both sexes," in "the selection of sports and levels of competition" for "both sexes." *Id.* § 106.41(c). HHS's predecessor promulgated these rules (the Department of Health, Education and Welfare ("HEW")), and explained that a school must "provide separate teams for men and women.'"[1]

---

[1] Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24128, 24134 (June 4, 1975) (now codified at 34 C.F.R. pt. 106).

Making these distinctions is critical to providing equal opportunities in areas like sports or private facilities. After all, "the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement" without sex-specific teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam). And consider places like restrooms, showers, and locker rooms where students may appear in a state of undress. Sex determines whether persons are similarly situated "because biological sex is the sole characteristic on which [separate restrooms] are based." *Adams*, 57 F.4th at 803 n.6. But "if 'sex' were ambiguous enough to include 'gender identity' … the various [Title IX] carveouts … would be rendered meaningless." *Adams*, 57 F.4th at 813. For example, those who identify as transgender "would be able to live in both living facilities associated with their biological sex and living facilities associated with their gender identity." *Id*. Title IX's exemptions only make sense if sex means biological sex.

This "postenactment history" sheds strong light on Title IX's "intended scope." *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982). Shortly after Congress enacted Title IX it passed the Javits Amendment directing HEW to publish rules implementing Title IX and submit them to Congress for review. Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974); 40 Fed. Reg. 24128 (June 4, 1975). After "six days of hearings to determine whether the HEW regulations were consistent with the law and with the intent of the Congress in enacting the law," Congress allowed the regulations to take effect. *N. Haven*, 456 U.S. at 531–32 (cleaned up). This procedure "was designed to determine if the regulation writers have read [Title IX] and understood it the way the lawmakers intended it to be read and understood." Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marq. Sports L. Rev. 11, 20 (2003) (cleaned up).

All this is why agencies and courts have always understood Title IX to permit sex-conscious decisions by affirming the need for women's-only sports teams. *E.g.*, *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 973 (9th Cir. 2010); *Pederson v. La. State Univ.*, 213 F.3d 858, 871, 878 (5th Cir. 2000); *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 269–70 (7th Cir. 1994); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993).

Congress moreover reaffirmed this construction when it amended Title IX in 1987 through the Civil Rights Restoration Act, Pub. L. 100–259; 102 Stat. 28 (Mar. 22, 1988) (codified at 20 U.S.C. § 1687). This Act dictated that Title IX's provisions applied to all education programs (including sports) at covered schools. In doing so, Congress "reaffirmed its prior positions on Title IX and its goal of achieving equity in all educational programs and activities, including athletics," and legislators "expressly cited the need to apply Title IX to athletics to remedy discrimination against female athletes" and to create "a more level playing field for female athletes." Samuels & Galles, *supra* at 23–24 (cleaned up). In the Act, Congress made an express finding in support of the "prior consistent and long-standing executive branch interpretation and broad, institution-wide application of" Title IX. § 2, 102 Stat. 28. No rule from HHS can achieve through "administrative fiat" what Congress has failed to do through legislation. *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 372 (N.D. Tex. 2021).

### 4. *Bostock* does not encompass Title IX.

Because males and females are not always similarly situated in educational contexts, Title IX permits and sometimes requires sex distinctions. This differs starkly from Title VII's employment context narrowly addressed in *Bostock v. Clayton County*, 590 U.S. 644 (2020). While Title IX has extensive and unique language

describing sex's biological binary, Title VII has a bare restriction on employment discrimination based on several traits, mentioning sex among others.

Title VII also prohibits discrimination in "employment practice[s]" "because of … sex," 42 U.S.C. § 2000e-2(a), whereas Title IX applies "on the basis of sex," 20 U.S.C. § 1681(a). *Bostock* concluded that "because of … sex" means but-for causation. *Bostock*, 590 U.S. at 656, 661. But "on the basis of sex" doesn't mean the same thing. *Neese*, 640 F. Supp. 3d at 679. Instead, "on the basis of sex" in Title IX means that biological sex must be the sole reason for action.

The statutes also have two different contexts, and, in "law as in life," context matters. *Yates v. United States*, 574 U.S. 528, 537 (2015). "[T]he same words, placed in different contexts, sometimes mean different things." *Id.* To comply with Title IX and give women equal opportunities, schools often "must consider sex." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Not so in deciding whether to hire or fire. So "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context," *id.*, especially where they would eviscerate the female educational opportunities the law was designed to promote.

In this rule, HHS wrongly invoked *Bostock* to find that Section 1557 (through Title IX) forbids gender-identity discrimination. This rendered HHS's rule contrary to law. *Bostock* expressly dealt only with hiring and firing in employment, 590 U.S. at 681, and *Bostock*'s "text-driven reasoning applies only to Title VII," *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023). The decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." *Bostock*, 590 U.S. at 681. *Bostock* further explicitly declined to opine about "bathrooms, locker rooms, or anything else of the kind," where sex is relevant. *Id.* But healthcare involves exactly such settings: examination rooms, lactation rooms, patients in undress, and discussions of intimate biological functions. *Adams*, 57 F.4th at 808 (*Bostock* did not prohibit sex distinctions where sex is relevant). Several courts

16

have thus noted that "the rule in *Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *e.g.*, *Adams*, 57 F.4th at 808, 818.

Title IX's rule of construction represents this same principle: "[N]othing in [Title IX] shall be construed to prohibit … maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Title IX is not violated every time "changing the [student's] sex would have yielded a different choice by the [school]." *Bostock*, 590 U.S. at 659–60. A dorm room assignment, or a doctor's judgment, legitimately considers sex. Title IX is not governed by *Bostock*.

Plenty of litigants have already tried, and failed, to show that Title IX prohibits schools from noticing sex. When some schools began cutting men's sports teams to bring themselves into compliance with Title IX, male athletes sued for sex discrimination—and lost. *E.g.*, *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002); *Chalenor v. Univ. of N.D.*, 291 F.3d 1042 (8th Cir. 2002); *see also Boulahanis v. Bd. of Regents*, 198 F.3d 633, 636 (7th Cir. 1999), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 259 (2009). Title IX allows considering sex. *See Boulahanis*, 198 F.3d at 639.

As with Title IX, so too it is with Section 1557. In choosing not to provide, refer for, or affirm gender-transition procedures, MCC takes into account the sex of the patient. Patients taking certain hormones to heal an ailment related to their sex, such as precocious puberty, allows them to be a healthy person of that sex. Patients taking hormones to purportedly change their sex is an action contrary to their health as a person of that sex. MCC affirms the former and rejects the latter. Referencing sex is inevitable when discussing procedures for "transition[ing] from one gender to another." *L.W.*, 83 F.4th at 482. "By the same token, the regulation of a course of treatment that only gender nonconforming individuals … undergo" is not unlawful

discrimination based on sex. *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229–30 (11th Cir. 2023).

Yet MCC's distinctions do not violate Title IX, because they are not discrimination on a ground prohibited by Title IX. Title IX allows distinctions based on legitimate sex differences. MCC "treat[s] similarly situated individuals evenhandedly." *L.W.*, 83 F.4th at 479. But by changing Section 1557 to a gender-identity nondiscrimination mandate in this new rule, HHS has rewritten Title IX and Section 1557 to ban MCC's ethical practice of medicine.

### 5. *Bostock* cannot apply to Title IX and Section 1557 without a clear congressional statement.

Title IX and Section 1557 do not include "gender identity" as a protected trait, but were there any doubt, the Constitution would require HHS to show a clearer statement from Congress before it could impose its mandates.

Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 679 (2023). Even in interpreting "expansive language," courts "insist on a clear" statement before intruding on the state's traditional powers over health, medicine, and education. *Bond v. United States*, 572 U.S. 844, 860 (2014).

Moreover, "Title IX was enacted as an exercise of Congress' powers under the Spending Clause." *Jackson*, 544 U.S. at 181. So was Section 1557. *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 585 (2012) (plurality). Therefore Congress must "speak with a clear voice," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), and give funding recipients unmistakably clear notice of their obligations, *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022). Congress may not use "expansive language," *Bond*, 572 U.S. at 857–58, 860, or surprise recipients with "retroactive conditions," *Pennhurst*, 451 U.S. at 25 (cleaned up), nor impose "a burden of unspecified proportions and weight, to be

18

revealed only through case-by-case adjudication," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 190 n.11 (1982).

But Congress' "intention" to include gender-identity in Title IX or Section 1557 is not "unmistakably clear in the language of the statute[s]." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up). To the contrary, doing so goes against those statutes' text and purpose. There is no serious argument that in 2010, much less 1972, Congress unmistakably required anyone to provide, refer for, or affirm gender-transition procedures. And the last thing one can say of Section 1557 and Title IX is that they clearly mandate using pronouns contrary to sex or enable men to "chestfeed" in rooms marked "Breastfeeding Moms Only," when the ACA itself expressly references males and females.

*Bostock* did not consider the "particularly strict" effect of the clear-notice canon when it interpreted Title VII. But interpreting Title IX requires the Court to apply these canons because Title IX uses a "contractual framework" and Title VII does not: Title IX obtains compliance as a condition on federal funds. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).

For the same reason, the major questions doctrine dooms this rule. Like HHS's nationwide ban on evictions, or the Labor Department's nationwide vaccine mandate, or the Education Department's nationwide student-loan forgiveness, or the EPA's nationwide restructuring of the energy industry, HHS's imposing of a gender-transition mandate on all medical caregivers in this rule is a matter of "staggering" "economic and political significance" — and Congress has given HHS no "clear" authority to impose this mandate. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2373

(2023) (cleaned up). The political significance is transparent — and the economic significance is massive, covering over $1 trillion.[2]

Finally, the rule's interpretation of Section 1557 and Title IX raises constitutional concerns that this Court should avoid by construing the rule according to its text's longstanding public meaning. *Infra* Pt.II.B–C. Under the constitutional-avoidance doctrine, if an act is subject to "competing plausible interpretations," *Clark v. Martinez*, 543 U.S. 371, 381 (2005), the statute must be construed "to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score," *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (cleaned up).

### B.   The rule violates the structural principles of federalism.

In four key ways, the rule's reinterpretation of Section 1557 and Title IX transgresses the federal constitution's structural principles of federalism.

*First*, for a statute to preempt the historic police powers of the States, to abrogate state sovereign immunity, or to regulate a matter in areas of traditional state responsibility, the Constitution limits the States' and the public's obligations to those requirements "unambiguously" set out on the face of the statute. *Pennhurst*, 451 U.S. at 17. But no funding recipient could unmistakably know or clearly understand that Section 1557 or Title IX would impose the mandates created by the rule as a condition of accepting federal funds from HHS. The public thus lacked the constitutionally required clear notice that the statutes would apply in this way when Section 1557 or Title IX was passed or when funding grants were made. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

---

[2] Ctrs. for Medicare & Medicaid Servs., U.S. Dep't of Health & Human Servs., National Health Expenditures 2022 Highlights 3, https://www.cms.gov/files/document/highlights.pdf (Dec. 12, 2023).

*Second*, HHS expressly and impliedly, but improperly, seeks to use a Spending Clause statute to preempt state laws. But Congress does not have that authority. An agency may not pay anyone to violate state law. Instead, if state law prevents the spending of federal funds in a certain way, the agency may only disallow funds. *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 183 (2023).

*Third*, the rule is an unconstitutionally coercive use of the Spending Clause. The rule threatens to withhold billions of dollars in funding unless States and medical caregivers act as if Section 1557 and Title IX cover new bases. Compl. [ECF 1] at ¶¶ 49–55. Federal Medicaid funding alone is about 27% of the average state budget. *Id.* ¶ 53. And any ineligibility for Medicare, Medicaid, or CHIP funding threatens to drive doctors out of the practice of medicine. *Id.* ¶ 194. The rule amounts to a "gun to the head" for the States and clinics. *NFIB*, 567 U.S. at 581 (plurality). Worse yet, the rule seeks to coerce States and medical caregivers to abandon their laws even though the federal government cannot try to force state governments to repeal their laws. *Murphy v. NCAA* 584 U.S. 453, 470–75 (2018).

## C.   The rule coerces speech in violation of the First Amendment.

The rule violates the First Amendment's Free Speech Clause. It censors and compels speech based on content and viewpoint, *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 168 (2015), and it attaches unconstitutional conditions to grant funding, *AOSI*, 570 U.S. at 214. The rule forces MCC to adopt and speak government policy statements that violate its sound medical judgment and to assure compliance. Compl. [ECF 1] at ¶¶ 119, 208–12; Artigues Decl. [ECF 1-2] at ¶¶ 15, 34–35, 40, 53–54. In addition, to avoid what HHS considers discrimination, harassment, or a hostile environment, the rule makes MCC avoid speaking its views, such as by advising patients that gender-transition procedures are harmful, and to speak in ways contrary to biological fact, such as by using incorrect pronouns, and prohibits. Compl.

[ECF 1] at ¶¶ 75, 93–96, 98–104, 106–08, 166–68, 289; Artigues Decl. [ECF 1-2] at ¶¶ 17–18. It forces MCC to remove its current policy from its website and requires the clinic to take down its signs saying "Breastfeeding Moms Only." 87 Fed. Reg. at 47866; Compl. [ECF 1] at ¶¶ 159, 169–70, 212–13; Artigues Decl. [ECF 1-2] at ¶¶ 15, 20–21, 34–35, 40, 53–54. This includes forcing MCC to say it does not discriminate based on abortion ("termination of pregnancy"). But performing, referring for, facilitating, or affirming abortion contradicts MCC's explicit pro-life policy and implies that MCC violates state law — so MCC cannot adopt such a misleading policy.

Because the rule coerces MCC's speech, the First Amendment triggers strict scrutiny. *E.g.*, *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018); *Meriwether*, 992 F.3d at 508. But the government lacks any legitimate objective "to produce speakers free" from purported bias, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578–79 (1995). Far from being "always" a "compelling interest," this interest is "comparatively weak" in the context of pronouns. *Meriwether*, 992 F.3d at 510. Narrower approaches also exist, like letting patients go elsewhere.

## III.   MCC faces irreparable harm.

MCC and its patients are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Without a delay of the rule, MCC must risk financial penalties or take steps to stop seeing Medicaid and CHIP patients, or harm patients — pressure meant to force MCC to violate its medical judgment, ignore state law, and harm patients.

A plaintiff's "harm is irreparable where there is no adequate remedy at law," *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011), and here there is no cause of action to recover damages from HHS. *AHM v. FDA*, 78 F.4th at 251. That means that the clinic's "economic injuries—the potential damage to [MCC's] medical practice, heightened exposure to malpractice liability, and increased ... costs—are

irreparable." *Id*. And any "loss of freedoms guaranteed by the First Amendment … constitute[s] per se irreparable harm." *Franciscan All., Inc.*, 47 F.4th at 380.

## IV.   The balance of equities and the public interest both favor relief.

For five reasons, the balance of the equities and the public interest strongly favor ensuring that no doctors must provide, refer for, or affirm transition efforts.

*First*, a delay would not harm HHS. HHS has "no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (cleaned up). To preserve the status quo courts regularly prevent agencies from implementing unlawful rules during litigation challenging their validity. *E.g.*, *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015). The status quo favors a delay order here. *Wages & White Lion*, 16 F.4th at 1143–44.

*Second*, in contrast, the imminent injury to MCC, patients, and medical caregivers outweighs any impact on HHS. A delay would ensure that no clinic like MCC is forced out of business, leaving underserved patients without care, and no clinic is liable for penalties simply for providing ethical medical care.

*Third*, the public interest is "served by maintaining our constitutional structure," giving state law its due. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618–19 (5th Cir. 2021). The rule irreparably harms States' sovereign interests in enforcing their laws and protecting patients. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

*Fourth*, it is impossible to change a person's sex, and gender-transition procedures lack a sound scientific basis. Cantor Decl. ¶¶ 9–14, 38–75, 103–155, 298–342 (attached to the motion as Exhibit A). Medicalized transition of gender remains experimental and there is no evidence that gender-transition procedures improve mental health, *Id.* ¶¶ 206–55, or reduce suicide or suicidality, *Id.* ¶¶ 181–95. There is no reliable evidence of effectiveness on minors' mental health when weighed against less risky treatments, *Id.* ¶¶ 220–55, and "social transition" (such as using

pronouns contrary to sex) is not associated with improvement in minors' mental health. *Id.* ¶¶ 124–29. In fact, multiple international healthcare systems that had expanded medicalized transition to include minors have reversed course based on systematic reviews concluding that the evidence on medicalized transition in minors is of poor quality. *Id.* ¶¶ 17–37, 76–101. Methodological defects limit or negate many such studies' evidentiary value. *Id.* ¶¶ 63–75.

But while the effectiveness of transition efforts is scientifically unknown and unproven, what is known is that gender-transition procedures are unsafe. *Id.* ¶¶ 256–97. The many harms associated with administering puberty blockers or cross-sex hormones to children and adolescents include: sterilization without proven fertility preservation options, permanent loss of capacity for breastfeeding, lifetime lack of orgasm and sexual function, interference with neurodevelopment and cognitive development, substantially delayed puberty associated with medical harms, elevated risk of Parkinsonism in adult females, reduced bone density, lifetime dependance on hormone treatments, increased cardiovascular risk, and hormone-dependent cancers, among other effects. *Id.* ¶¶ 256–85. In particular, assertions that puberty blockers act only as a "fully reversible" "pause button" lack scientific evidence. *Id.* ¶¶ 286–97.

*Fifth* and finally, delaying the rule as to its gender-identity requirements is fully appropriate under 5 U.S.C. § 705. When an agency rule of broad applicability is unlawful, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up). "Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc.*, 47 F.4th at 374–75. By extension, at the outset of a case, "a stay is the temporary form of vacatur." *AHM v. FDA*, 78 F.4th at 254. HHS in fact regularly consents to using 5 U.S.C. § 705 to delay its rules' effective dates. *E.g.*, HHS, Grants Regulation, 87 Fed. Reg. 31432 (May 24, 2022) (delays over 15 months);

HHS, Delay of SUNSET Rule, 87 Fed. Reg. 12399 (Mar. 4, 2022) (delay over 18 months). HHS has sometimes conceded that the proper remedy for an APA violation is to delay or vacate the agency action as a whole. *Tice-Harouff v. Johnson*, No. 6:22-cv-201, ECF No. 38 (E.D. Tex. Dec. 6, 2022); *Facing Foster Care in Alaska v. HHS*, No. 21-cv-00308, ECF No. 44 (D.D.C. June 29, 2022).

A delay is not only the well-established remedy to issue — it is the most effective remedy to stop this rule's coercion. Without relief, MCC is in danger, as the rule is easy to enforce. HHS invites patients who want to change MCC's medical practices and speech to file complaints against it at HHS for violating the rule — precisely so HHS can impose draconian investigations and threats against MCC's funding unless it chooses to ignore biological science and begin harming children.

## CONCLUSION

Therefore, the Court should grant this motion, delay the rule's effective date, and enjoin HHS from enforcing it pending the outcome of this case.[3]

Respectfully submitted this 3rd day of June, 2024.

*/s/ D. Michael Hurst, Jr.*

**Matthew S. Bowman, PHV 60348**
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
mbowman@ADFlegal.org

**D. Michael Hurst, Jr., MB 99990**
**Nash E. Gilmore, MB 105554**
**Phelps Dunbar LLP**
4270 I-55 North
Jackson, Mississippi 39211-6391
Telephone: (601) 352-2300
Facsimile: (601) 360-9777
mike.hurst@phelps.com
nash.gilmore@phelps.com

*Counsel for Plaintiff*
*McComb Children's Clinic, LTD.*

---

[3] Because the injunctive relief requested would serve the public interest, MCC asks the Court to exercise its discretion to not require a security or bond under Fed. R. Civ. P. 65(c). *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981).

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2024, I electronically filed the foregoing and its attachments with the Clerk of the Court for the United States District Court Southern District of Mississippi by using the CM/ECF system. I further certify that I served Defendants by emailing the foregoing to counsel for Defendants, Liam C. Holland, Trial Attorney, Civil Division, Federal Programs Branch, U.S. Department of Justice, who represented to counsel for Plaintiff that Defendants would accept service of this memorandum and its accompanying papers by email to him.

_/s/ D. Michael Hurst, Jr._

*Counsel for Plaintiff*
*McComb Children's Clinic, LTD.*