## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## WESTERN DIVISION

| | | |
|---|---|---|
| **McComb Children's Clinic, LTD.,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No.** 5:24-cv-00048-LG-ASH |
| | ) | |
| **Xavier Becerra**, et al., | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

HHS's rule forces clinics to perform and promote "gender-transition" procedures that block puberty and remove kids' healthy body parts. This Court temporarily delayed that unlawful rule. Plaintiff McComb Children's Clinic is entitled to permanent protection from this requirement for the same reasons.

## BACKGROUND

### I.    The rule forces clinics to perform and promote "gender-transition" procedures or lose all federal funding.

Earlier this year, Defendant United States Department of Health and Human Services ("HHS") published—and this Court stayed—a rule seeking to preempt state laws that protect children from the serious, life-altering effects of transition procedures. *Tennessee v. Becerra*, No. 1:24cv161, 2024 WL 3283887, at *13–*14 (S.D. Miss. July 3, 2024), *staying portions of* Nondiscrimination in Health Programs and Activities, 89 FR 37522 (May 6, 2024). Under the rule, a clinic "must not … [d]eny or limit health services sought for purpose of gender transition … that [it] would provide … for other purposes." 89 FR at 37700–01 (45 C.F.R. § 92.206(b)(4)). This means that a clinic must provide or refer for procedures sought for transition

purposes, if it would provide or refer for the same procedures for medical purposes. Plus a clinic must use patients' self-selected pronouns and allow males in female hospital and lactation rooms. *Id.* at 37535, 37698–701 (45 C.F.R. §§ 92.101, 92.206); *see also* HHS Nondiscrimination in Health Programs and Activities, 87 FR 47824, 47866–67 (proposed Aug. 4, 2022). Any clinic that refuses to comply loses all federal health funding, including Medicaid and CHIP. 45 C.F.R. §§ 8 0.8, 92.303.

The rule makes McComb Children's Clinic, LTD. ("MCC") ineligible to help the neediest patients. MCC is a pediatric clinic in southwest Mississippi that cares for Medicaid and CHIP patients. Decl. of Michael Artigues, M.D., F.C.P. [ECF 1-2] ¶¶ 3, 7, 61 ("Artigues Decl."). MCC cares for all kids, including patients who identify contrary to their sex. *Id.* ¶¶ 10, 27–28. But MCC cannot perform, refer for, or affirm transition procedures that block puberty or remove healthy body parts. *Id.* ¶ 11–13.

## II.   This Court and two others have held the rule unlawful.

HHS's gender-transition rule purports to "clarify" Section 1557 of the Affordable Care Act ("ACA"), which incorporates Title IX of the Education Amendments of 1972. On the theory that the categories of men and women are identity-based rather than biological, the rule defines "[d]iscrimination on the basis of sex" to include "gender identity." 89 FR at 37699 (45 C.F.R. § 92.101(a)(2)).

But Congress enacted the ACA because of "women's unique health care needs," 42 U.S.C. § 1315a(b)(2)(B)(i), and this Court and two others swiftly recognized the rule's unlawfulness. *Tennessee v. Becerra*, 2024 WL 3283887, 13–*14; *Texas v. Becerra*, No. 6:24-cv-211, 2024 WL 3297147, at *12 (E.D. Tex. July 3, 2024); *Florida v. HHS*, No. 8:24-cv-1080, 2024 WL 3537510, at *20–*21 (M.D. Fla. July 3, 2024). Congress never, "with a 'clear voice,' adopted an ambiguous or evolving definition of 'sex' when it acted to promote educational opportunities for women in 1972." *Tennessee v. Becerra*, 2024 WL 3283887, at *13. As this Court further explained,

2

"Neither Title IX nor Section 1557 contain clear statements prohibiting discrimination on the basis of gender identity; they only refer to 'sex.'" *Id*. at *9, *13–*14. Plaintiffs like MCC "would have had no way of knowing that sex discrimination would be interpreted [this way] when they accepted federal funding." *Id*. at *9.

To ensure that underserved Mississippi kids do not lose their healthcare providers, MCC seeks vacatur of the rule, a permanent injunction, and partial final judgment on its claim that HHS lacks authority under the ACA to issue its gender-identity mandates. Fed. R. Civ. P. 54(b) & 56; Compl. [ECF 1] ¶¶ 256–64, 266. About 75% of MCC's patients pay through Medicaid or CHIP. Artigues Decl. [ECF 1-2] ¶ 7. Unless the rule is stopped for good, HHS will likely take the clinic's funding away— likely closing its doors. *Id*. ¶¶ 62–63.

## STANDARD FOR GRANTING THE MOTION

Summary judgment is proper when the pleadings and evidence show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). A movant must "identify[ ] those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact." *Harrison Cnty. v. Miss. River Comm'n*, No. 1:19cv986, 2021 WL 4164679, at *6 (S.D. Miss. Sept. 13, 2021). The nonmoving party must point to "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The Court views "the evidence in the light most favorable to the non-moving party," *WMS Indus., Inc. v. Fed. Ins. Co.*, 588 F. Supp. 2d 735, 753 (S.D. Miss. 2008), which "may not rest upon mere allegations or denials." *Harrison Cnty.*, 2021 WL 4164679, at *6.

Partial final judgment is proper when "there is no just reason for delay and upon an express direction of the entry of final judgment." Fed. R. Civ. P 54(b).

The Administrative Procedure Act ("APA") requires courts to "hold unlawful and set aside" a rule when it is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). No consideration of equitable factors is needed for vacatur. *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951–52 (5th Cir. 2024).

A permanent injunction is appropriate when (1) the plaintiff succeeded on the merits, (2) the plaintiff faces irreparable injury and legal remedies, such as monetary damages, are inadequate; (3) when "the balance of hardships between the plaintiff and defendant" warrant relief; and (4) when relief is in the public interest. *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 368 (N.D. Tex. 2021) (cleaned up).

## ARGUMENT

## I.   This Court has jurisdiction.

MCC has standing. Regulations "that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). This is one of those cases.

### A.   The rule requires and forbids MCC's actions.

The rule requires or forbids MCC's actions in at least five ways. *First*, the rule forces MCC to perform or refer for transition procedures or lose funding. A clinic "must not … [d]eny or limit health services sought for purpose of gender transition or other gender-affirming care that [it] would provide … for other purposes." 89 FR at 37700–01 (45 C.F.R. § 92.206(b)(4)). If a surgeon performs mastectomies for cancer, he must remove breasts for transition purposes. *Id.*; 87 FR at 47867. Likewise, because MCC refers kids for medicines to treat early puberty, the rule forces MCC to refer kids for hormones to "transition." Artigues Decl. [ECF 1-2] ¶ 25–26. And because

4

MCC helps new moms breastfeed, the rule forces MCC to help men "chestfeed." *Id.* ¶¶ 20–23. The rule forbids MCC's categorical opposition to transition procedures—calling its position "animus," "bias," and "pretext," rather than "legitimate" or "nondiscriminatory." 89 FR at 37701 (45 C.F.R. § 92.206(c)). Under the rule, a clinic's position "that gender transition or other gender-affirming care can never be beneficial … (or its compliance with a State or local law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate." 89 FR at 37597; *see also* 87 FR at 47868 & n.423, 47874. HHS likewise says that a clinic's view that transition procedures are "experimental or cosmetic" is "not based on current standards of medical care." 87 FR at 47874.

*Second*, the rule preempts MCC's "state-created right[s]" not to perform, refer for, or affirm transition procedures—which "creates Article III injury." *Deanda v. Becerra*, 96 F.4th 750, 753 (5th Cir. 2024). State law protects MCC from having to perform, refer for, or affirm transition procedures. Miss. Code Ann. §§ 41-107-1 to -13, 41-141-1 to -9. But the rule sweeps these rights aside. 89 FR at 37535.

*Third*, the rule makes MCC allow males identifying as female to access female sex-specific services and facilities. *Id.* at 37593, 37698–701 (45 C.F.R. §§ 92.101, 92.206). MCC refers new moms for lactation consultations and provides private spaces for new moms to breastfeed. MCC provides these lactation referrals and rooms by sex—not gender identity. Artigues Decl. [ECF 1-2] ¶¶ 20–23. But under the rule MCC must give lactation referrals to males who identify as female and allow males who identify as female into "Breastfeeding Moms Only" rooms. *Id.* ¶¶ 20–21.

*Fourth*, the rule coerces MCC to affirm transition procedures. Under the rule, MCC must provide what HHS calls "accurate information about gender-affirming care." 89 FR at 37598. The rule censors MCC from expressing its medical judgment, deeming it a "hostile environment" if MCC shares its medical view that transition procedures are categorically harmful, experimental, and cosmetic. *Id.* at 37596,

37698–701 (45 C.F.R. §§ 92.101, 92.206); 87 FR at 47874. MCC must also use patients' self-selected non-biological pronouns, 89 FR at 37596, and be willing to say that males can get pregnant and give birth, 87 FR 47824, 47865. If MCC does not, it faces liability for harassment and hostility, 89 FR at 37596, and for denying "equal program access," *id*. at 37701 (45 C.F.R. § 92.206).

*Fifth*, the rule compels MCC to adopt HHS's views. Clinics must submit assurances promising HHS that they follow the rule. 89 FR at 37693, 37696 (92 C.F.R. §§ 92.1(b), 92.5). Clinics must adopt, hand out to all patients, and prominently post on their office walls new HHS-approved gender-identity policies. *Id*. at 37693, 37696–98 (45 C.F.R. §§ 92.1(b), 92.8, 92.10). And clinics must train their employees to comply. *Id*. at 37697 (45 C.F.R. §§ 92.9).

This is injury. *Florida*, 2024 WL 3537510, at *6, *12. HHS may not use funding conditions to compel a recipient to abandon or adopt a viewpoint. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 221 (2013). But the rule forces MCC to abandon its policy against providing, referring for, or affirming transition efforts. Artigues Decl. [ECF 1-2] ¶¶ 15, 34–35, 40, 53–54. The clinic must take down this policy from its website, *id*. ¶ 42, and MCC must remove its "Breastfeeding Moms Only" signs so men can use MCC's lactation rooms, *id*. ¶¶ 20–21. Then, MCC must adopt, publish, and reeducate employees on new policies under which MCC implies that it would perform, refer for, or affirm transition procedures. *Id*. ¶¶ 34, 54.

When a plaintiff is the "object of" a rule, "there is ordinarily little question" it has standing. *Tennessee v. Becerra*, 2024 WL 3283887, at *10 (cleaned up). There is no serious dispute that MCC is an object of the rule: it receives the requisite HHS funding under Medicaid and CHIP to be fully subject to the rule. *See* Compl. [ECF 1] ¶¶ 181–84. That is why similar plaintiffs each had standing to bring their challenges. *Tennessee, v. Becerra* 2024 WL 3283887, at *4, *10–*12; *Texas v. Becerra*, 2024 WL 3297147, at *1; *Florida*, 2024 WL 3537510, at *5–*6.

6

**B.      The rule imposes non-recoverable economic losses.**

MCC faces irreparable financial harm in two forms. If MCC does not comply, it faces the imminent loss of Medicaid and CHIP funding. Compl. [ECF 1] ¶¶ 57–66, 138–52. This "economic injury is a quintessential injury upon which to base standing." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). And if MCC complies, it must provide services that it believes harm kids and must incur nonrecoverable compliance costs. *Tennessee v. Becerra*, 2024 WL 3283887, at \*4, \*10– \*11. It must spend time and money reviewing the rule, changing policies, providing notices, training employees, and keeping records. 89 FR at 37677–85, 37689. Some costs started already, Artigues Decl. [ECF 1-2] ¶¶ 31–50, and more are "fairly likely[.]" *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021).

These costs are "obvious" concrete harms. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). They are particularized because they affect MCC individually, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016). And these harms "will likely be redressed by" judicial relief because a final judgment would prevent MCC "from incurring compliance costs." *Tennessee v. Becerra*, 2024 WL 3283887, at \*4.

**C.      MCC's claims may proceed now.**

HHS has claimed MCC must suffer "years" of HHS investigations to have standing. Defs.' Mem. Opp. Prelim. Inj. [ECF 18] at 27. Not so.

Clinics like MCC "'are entitled to receive clarification from this court before … exposing themselves to punishment or enforcement action.'" *Tennessee v. Becerra*, 2024 WL 3283887, at \*11 (quoting *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 927–28 (5th Cir. 2023)). The challenged rule is "a final agency action" subject to immediate review. *Texas v. EEOC*, 933 F.3d 433, 441–42, 444, 446, 449 (5th Cir. 2019). When an entity "realistically expects" that its policies "will be perceived by the Department as a violation," it has shown "a sufficiently distinct and palpable injury."

*Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1118 (D.C. Cir. 2005). APA review exists for all rules, "not just those that impose a self-executing sanction." *Sackett v. EPA*, 566 U.S. 120, 128–31 (2012). So MCC "need not 'wait[ ] for [HHS] to "drop the hammer" in order to have [its] day in court.'" *Texas v. Cardona*, No. 4:23-cv-00604, 2024 WL 3658767, at *22 (N.D. Tex. Aug. 5, 2024) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016)).

MCC also faces a credible threat of enforcement. HHS says "robust enforcement of section 1557 is critical." 89 FR 37616. And MCC's "course of action is within the plain text" of the rule's prohibitions. *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023). So MCC's "loss of federal funds is a matter of when, not if." *Texas v. Becerra*, 2024 WL 3297147, at *9.

Nor is any further factual development necessary. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003). In an APA case, the "'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). And for this particular claim—whether the gender identity mandate exceeds HHS's statutory authority—no administrative record is needed beyond the rule itself. *See Tennessee v. Cardona*, No. 2:24-cv-072, 2024 WL 3584361 at *3 (E.D. Ky. July 16, 2024) (refusing to delay summary judgment briefing because the court can resolve the correct interpretation of Title IX under 5 U.S.C. § 706 on the parts of the administrative record cited by the parties). This Court has resolved the key legal issue, holding that "HHS exceeded its statutory authority." *Tennessee v. Becerra*, 2024 WL 3283887, at *5, *10. The Court can thus enter partial summary judgment on this claim, as there is "no reason for delay." Fed. R. Civ. P 54(b).

## II. Congress never authorized HHS's gender-transition mandate.

Congress never included "gender identity" in Section 1557 or Title IX. The ACA is a healthcare law that acknowledges sex according to biology, and it is based on a

1972 educational law that does the same. 20 U.S.C. § 1681(a). Congress enacted the ACA because of "women's unique health care needs." 42 U.S.C. §§ 1315a(b)(2)(B)(i). Congress never, "with a 'clear voice,' adopted an ambiguous or evolving definition of 'sex' when it acted to promote educational opportunities for women in 1972." *Tennessee v. Becerra*, 2024 WL 3283887, at *13. Redefining "sex" to mean gender identity negates the ACA's text and renders it incoherent. The federal government thus has no power to threaten billions of dollars in low-income patients' healthcare funding to force clinics to participate in these unproven and harmful procedures.

### A.     The statutes prohibit treating one sex worse than the other.

Two statutes converge in Section 1557: the ACA and Title IX. Section 1557 prohibits discrimination "on the ground prohibited under … title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX, in turn, states: "No person in the United States shall, on the basis of sex, … be subjected to discrimination under any education program or activity." 20 U.S.C. § 1681(a). "Neither Title IX nor Section 1557 contain clear statements prohibiting discrimination on the basis of gender identity; they only refer to 'sex.'" *Tennessee v. Becerra*, 2024 WL 3283887, at *9.

Title IX is an equal-opportunity law enacted to promote women's academic and athletic opportunities. Title IX thus "not only permit[s], but at times require[s], consideration of sex as well as separation on the basis of sex." *Id*. at *13. When Title IX was adopted in 1972, "on the basis of sex" was commonly understood to refer to biological differences between males and females. *Id*. at *7. Sex was considered an "immutable" trait, "determined solely by the accident of birth." *Id*. (cleaned up). Congress thus used "sex" throughout Title IX to denote the male-female biological binary. *Neese v. Becerra*, 640 F. Supp. 3d 668, 684 (N.D. Tex. 2022). For instance, Title IX lets schools go from admitting "students of one sex" to admitting "students of both sexes." 20 U.S.C. § 1681(a)(2).

Congress spoke similarly when it enacted the ACA in 2010. Because women have different health needs than men, the ACA refers to "women" and mothers separately from "men," and protects "women's unique health care needs." 42 U.S.C. §§ 1315a(b)(2)(B)(i); *e.g.*, 42 U.S.C. §§ 237a, 242s, 280g-12(a)(3)(B), 280k(b)(1), 300gg-13(a)(4), 711, 712 (note), 713(c)(1), 1396d(l)(3)(b)(2) & (bb)(1), 18201–03. The ACA provides "information to women and health care providers on those areas in which differences between men and women exist," 21 U.S.C. § 399b, and uses the binary pronouns "his or her," *e.g.*, Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119, 261, 670, 785, 809, 837, 966.

The rule's gender-identity contrivance requires ignoring sex distinctions, but Title IX and Section 1557 allow and sometimes require sex distinctions. They prohibit "treating women worse than men and vice versa." *Texas v. Becerra*, 2024 WL 3297147, at *1. And sex "discrimination" suggests not just any distinction on the basis of sex, which may be legitimate, but "a *negative* distinction or differential treatment for the *wrong reasons*." *Texas v. Cardona*, 2024 WL 3658767, at *31 (emphasis added).

What constitutes an unjustified distinction depends on the context, as a statute "cannot be divorced … from the evil which Congress sought to correct." *Tennessee v. Becerra*, 2024 WL 3283887, at *13 (cleaned up). Here Title IX's well-established purpose was to promote opportunities for women. *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004). Likewise, the ACA addresses "women's unique health care needs." 42 U.S.C. §§ 1315a(b)(2)(B)(i).

### 1.      Title IX allows and sometimes requires sex distinctions.

Because men and women are often not similarly situated, Title IX allows sex distinctions. *Tennessee v. Becerra*, 2024 WL 3283887, at *10. Congress said "nothing contained herein shall be construed to prohibit … separate living facilities for the different sexes." 20 U.S.C. § 1686. This rule of construction reflects that "sex" refers

10

to biology, not gender identity. As Senator Birch Bayh (D-IN) said, "I do not read [Title IX] as requiring integration of dormitories between the sexes, nor do I feel it mandates the desegregation of football fields. What we are trying to do is provide equal access for women and men students. ... not requiring that intercollegiate football be desegregated, nor that the men's locker room be desegregated." 117 Cong. Rec. S. 30407 (Aug. 6, 1971). Title IX also exempts "father-son or mother-daughter activities," 20 U.S.C. § 1681(a)(8); fraternities "limited to ... one sex," *id.* § 1681(a)(6); and beauty pageants "limited to ... one sex only," *id.* § 1681(a)(9). Though fraternities and beauty pageants are not strictly necessary for education, Congress protected them anyway, as single-sex spaces are not necessarily discriminatory.

Likewise, contemporaneous Title IX regulations "permit, and sometimes even require, consideration of sex." *Tennessee v. Becerra*, 2024 WL 3283887, at *10. These regulations protect (1) single-sex sex education, 34 C.F.R. § 106.34(a)(3); (2) "separate toilet, locker room, and shower facilities on the basis of sex," *id.* § 106.33; (3) separate "physical education classes," *id.* § 106.34(a)(1); and (4) "separate [sports] teams for members of each sex," *id.* § 106.41(b). Schools must provide "equal athletic opportunity for members of both sexes" in "the selection of sports and levels of competition" for "both sexes." *Id.* § 106.41(c). HHS's predecessor (the Department of Health, Education and Welfare (HEW)) promulgated these rules. Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 FR 24128, 24134 (June 4, 1975) (34 C.F.R. pt. 106).

This "postenactment history" sheds light on Title IX's "intended scope." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982). Shortly after Congress enacted Title IX, it passed the Javits Amendment directing HEW to publish these rules implementing Title IX and submit them to Congress for review. Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974); 40 FR 24128 (June 4, 1975). After "six days of hearings to determine whether the HEW regulations were consistent with the law

and with the intent of the Congress in enacting the law," Congress let the regulations take effect. *N. Haven*, 456 U.S. at 531–32 (cleaned up). This procedure "was designed to determine if the regulation writers have read [Title IX] and understood it the way the lawmakers intended it to be read and understood." Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 Marq. Sports L. Rev. 11, 20 (2003) (cleaned up).

Congress again reaffirmed this construction when it amended Title IX in 1987 through the Civil Rights Restoration Act, Pub. L. 100–259; 102 Stat. 28 (Mar. 22, 1988) (codified at 20 U.S.C. § 1687). This Act dictated that Title IX applied to all education programs (including sports) at covered schools. In doing so, Congress "reaffirmed its prior positions on Title IX and its goal of achieving equity in all educational programs and activities, including athletics," and legislators "expressly cited the need to apply Title IX to athletics to remedy discrimination against female athletes" and to create "a more level playing field for female athletes." Samuels & Galles, *supra* at 23–24 (cleaned up). Congress made an express finding supporting the "prior consistent and long-standing executive branch interpretation and broad, institution-wide application of" Title IX. § 2, 102 Stat. 28.

After all, making sex distinctions is critical to providing equal opportunities in areas like sports or private facilities. "[T]he great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement" without sex-specific teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam). And in places like restrooms, showers, and locker rooms where students may appear in a state of undress, sex determines whether persons are similarly situated because it "is the sole characteristic on which [separate restrooms] are based." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.6. (11th Cir. 2022) (en banc). But "if 'sex' were ambiguous enough to include 'gender identity' … the various [Title IX] carveouts … would be rendered

meaningless." *Id.* at 813. Males "would be able to live in both living facilities associated with their biological sex and living facilities associated with their gender identity." *Id.* Title IX thus makes "sense only if 'on the basis of sex' means 'on the basis of biological sex,' not 'on the basis of gender identity or sexual orientation.'" *Texas v. Becerra*, 2024 WL 3297147, at *6.

Thus for decades courts have understood Title IX to permit sex-conscious decisions by affirming the need for women's-only sports teams. *E.g.*, *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 973 (9th Cir. 2010); *Pederson v. La. State Univ.*, 213 F.3d 858, 871, 878 (5th Cir. 2000); *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 269–70 (7th Cir. 1994); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993).

Many courts have thus enjoined the federal government's recent efforts to redefine sex to mean gender identity in Title IX, concluding that in education as with healthcare, sex means sex. *Oklahoma v. Cardona*, No. CIV-24-00461, 2024 WL 3609109, at *12 (W.D. Okla. July 31, 2024); *Arkansas v. U.S. Dep't of Educ.*, No. 4:24-cv-636, 2024 WL 3518588, at *15 (E.D. Mo. July 24, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-cv-00461, 2024 WL 3381901, at *3 (N.D. Tex. July 11, 2024); *Texas v. United States*, No. 2:24-CV-86, 2024 WL 3405342, at *6 (N.D. Tex. July 11, 2024); *Kansas v. U.S. Dep't of Educ.*, No. 24-4041, 2024 WL 3273285, at *8 (D. Kan. July 2, 2024), *appeal docketed* No. 24-3097 (10th Cir. July 11, 2024); *Tennessee v. Cardona*, Civil Action No. 2:24-072, 2024 WL 3019146, at *9 (E.D. Ky. June 17, 2024), *appeal docketed* No. 24-5588 (6th Cir. June 26, 2024); *Louisiana v. U.S. Dep't of Educ.*, 3:24-CV-00563, 2024 WL 2978786, at *4 (W.D. La. June 13, 2024), 2024), *appeal docketed* No. 24-30399 (5th Cir. June 25, 2024); *Texas v. Cardona*, 2024 WL 3658767, at *28–40; *Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 839 (E.D. Tenn. 2022), *aff'd*, 104 F.4th 577 (6th Cir. 2024).

### 2.    The ACA requires sex distinctions and does not mandate transition procedures.

Congress understood in the ACA that biology matters in medicine. The ACA seeks to address "women's unique health care needs." 42 U.S.C. §§ 1315a(b)(2)(B)(i). But redefining "sex" to mean gender identity undermines Congress's use of sex-based terms in this biological field.

The ACA adopts the sex-based biological binary, repeatedly referring to "women" and mothers distinctly from "men." *Id*.; *see also, e.g.*, 42 U.S.C. §§ 237a, 242s, 280g-12(a)(3)(B), 280k(b)(1), 300gg-13(a)(4), 711(d)(4)(C), 712 (note), 713(c)(1), 1396d(l)(3)(B)(ii) & (bb)(1), 18201(1), 18202(a), 18203. Its provision on obstetrics and gynecological care applies only to a "female participant." 42 U.S.C. § 300gg–19a(d)(1)(A). The ACA uses the term "pregnant women" in a sex-exclusive manner, *e.g.*, 42 U.S.C. §§ 280k(b)(1), 711(d)(4), 1396w–3(b)(1)(F), 18203(d), referring, for example, to "a woman who is pregnant, and the father of the child," 42 U.S.C. §§ 711(k)(2)(A). In the statute's single express reference to the term "sex" (Section 1557 only incorporates it by reference), the ACA requires analysis of clinical trials "data by sex" as well as the provision of "information to women and health care providers on those areas in which differences between men and women exist." 21 U.S.C. § 399b.

This Court and two others have thus held the rule unlawful, recognizing that in the ACA the word sex means sex—not gender identity. *Tennessee v. Becerra*, 2024 WL 3283887, at *6; *Texas v. Becerra*, 2024 WL 3297147, at *1; *Florida*, 2024 WL 3537510, at *8–*11. "Nothing in these statutes authorizes HHS … to require healthcare providers to perform novel 'gender-transition' procedures or force States to subsidize them." *Texas v. Becerra*, 2024 WL 3297147, at *1.

### B.    *Bostock* does not control Title IX or the ACA.

Because males and females are not always similarly situated in healthcare or education, the ACA and Title IX permit and at times require sex distinctions—a far

cry from the Title VII employment context in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020). The ACA and Title IX use distinctive language describing sex's biological binary; Title VII has a bare restriction on employment discrimination based on sex.

Title VII prohibits discrimination in "employment practice[s]" "because of … sex," 42 U.S.C. § 2000e-2(a), while Title IX applies "on the basis of sex," 20 U.S.C. § 1681(a). *Bostock* concluded that "because of … sex" means but-for causation. *Bostock*, 590 U.S. at 656, 661. But "on the basis of sex" does not mean the same thing. *Tennessee v. Becerra*, 2024 WL 3283887, at *6–*8, *10; *Neese*, 640 F. Supp. 3d at 679. "While 'because of' and 'on the basis of' are similar phrases, the use of the indefinite article—'the'—indicates that *the* basis of the discrimination must be the student's sex." *M.K. ex rel. Koepp v. Pearl River Cnty. Sch. Dist.*, No. 1:22-cv-25, 2023 WL 8851661, at *8 (S.D. Miss. Dec. 21, 2023), *appeal docketed* No. 24-60035 (5th Cir. Jan. 22, 2023). Plus, unlike *Bostock*'s Title VII assessment, Title IX often operates to "ensure[ ] equal treatment between groups of men and women," *Bostock*, 590 U.S. at 671, or, put differently, to "achieve classwide equality between the sexes[,]" *id*. at 664.

The statutes' contexts also differ, *Texas v. United States*, 2024 WL 3405342, at *7, and in "law as in life," context matters. *Yates v. United States*, 574 U.S. 528, 537 (2015). To comply with Title IX and give women equal opportunities, schools often "must consider sex." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Not so in deciding whether to hire or fire. So "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context," *id*., especially when they would gut female educational opportunities. *Tennessee v. Becerra*, 2024 WL 3283887, at *10.

Throughout this rule, HHS invoked *Bostock* to sweep gender identity into its scope. But *Bostock* dealt only with hiring and firing in employment, 590 U.S. at 681, and *Bostock*'s "text-driven reasoning applies only to Title VII," *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023). The decision did not "sweep beyond

Title VII to other federal or state laws that prohibit sex discrimination." *Bostock*, 590 U.S. at 681. *Bostock* declined to opine about "bathrooms, locker rooms, or anything else of the kind," where sex is relevant. *Id*. Healthcare involves exactly these settings: exam rooms, lactation rooms, undressed patients, and discussions of intimate biological functions. *Adams*, 57 F.4th at 808. And "importing *Bostock*'s holding" to Title IX "would mean that schools could not consider sex to create sports teams." *Texas v. Cardona*, 2024 WL 3658767, at *37. Several courts thus noted that "the rule in *Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *e.g.*, *Adams*, 57 F.4th at 808, 818.

Plenty of litigants have already tried, and failed, to show that Title IX prohibits schools from noticing sex. When some schools cut men's sports teams to bring themselves into compliance with Title IX, male athletes sued for sex discrimination— and lost. *See, e.g.*, *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002); *Chalenor v. Univ. of N.D.*, 291 F.3d 1042 (8th Cir. 2002); *see also Boulahanis v. Bd. of Regents*, 198 F.3d 633, 636, 639 (7th Cir. 1999), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 259 (2009).

As with education under Title IX, healthcare under Section 1557 is an "area[] of life in which an individual's biological sex is often relevant and sometimes critical." *Texas v. Becerra*, 2024 WL 3297147, at *7. MCC makes distinctions based on sex that are essential to good medicine and health. Giving patients hormones to address precocious puberty addresses an important medical concern, helping a child's health. But MCC has determined that giving kids hormones for so-called "gender transition" goes against their health. These distinctions do not violate Title IX or Section 1557 because MCC "treat[s] similarly situated individuals evenhandedly." *L.W.*, 83 F.4th at 479. Title IX and Section 1557 allow these distinctions based on sex differences.

It does not matter that "transgender individuals [purportedly] are the only individuals who seek transition-related care." 87 FR at 47871. Title IX prohibits only

"intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). The "regulation of a course of treatment that only gender nonconforming individuals … undergo" is not unlawful "unless the regulation were a pretext for invidious discrimination." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229–30 (11th Cir. 2023); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022). But transition procedures are not "an irrational object of disfavor." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993).

Nor is there any merit to HHS's claim that Section 1557's reference to "the ground prohibited under … title IX" adopts only the provision barring sex discrimination, divorced from the bevy of surrounding provisions that allow for differential treatment of the sexes. 89 FR at 37530–32. HHS's "unworkable" interpretation disregards critical text and context. *Tennessee v. Becerra*, 2024 WL 3283887, at *9–*10. Congress intended Section 1557 to incorporate all Title IX by using "et seq." *Et seq.*, Black's Law Dictionary (11th ed. 2019) ("And those (pages or sections) that follow"). And the provisions that follow, like Title IX's rule of construction at 20 U.S.C. § 1686, inform how courts understand sex discrimination.

No other statute saves the rule. The rule in passing claims power from a hodgepodge of other Spending Clause statutes. 89 FR at 37691–92, 37698–701 (42 C.F.R. §§ 438.3, 438.206, 440.262, 457.495, 460.98, 460.112; 45 C.F.R. §§ 92.101(a), 92.206(a), 92.208–98.211). "But as with Section 1557 and Title IX, these provisions do not authorize the sweeping changes that HHS, through CMS, attempts here." *Texas v. Becerra*, 2024 WL 3297147, at *8. No statute unmistakably speaks to gender identity. The rule is thus "ultra vires." *Florida*, 2024 WL 3537510, at *13.

Finally, HHS repeatedly says clinics might abandon children to broken bones because of gender identity. *See* Defs.' Mem. Opp. Prelim. Inj. [ECF 18] at 9. MCC would never do this, and there is no basis to believe it is a real problem anywhere, much less one giving HHS statutory authority where none exists. Regardless, the rule

reaches far beyond broken bones and sore throats and never even mentions them. HHS's lack of authority to issue this radically broad rule cannot be ignored as if the rule only encompasses a far narrower scope that HHS never proposed.

### C.  *Bostock* cannot apply to Title IX and the ACA without a clear congressional statement.

Title IX and Section 1557 do not include "gender identity." Even if there were any doubt, HHS would need a clearer statement from Congress under the major questions doctrine, the clear-notice canon, and the constitutional-avoidance doctrine.

### 1.  The rule violates the major questions doctrine.

The major questions doctrine applies because the federal government attempts "'an enormous and transformative expansion in [its] regulatory authority.'" *Tennessee v. Cardona*, 2024 WL 3019146, at *14. The rule concerns a matter of "staggering" "economic and political significance." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (cleaned up). The political import is transparent—and the economic significance is massive, covering over $1 trillion in medical transition expenses.[1] The rule's scope is no less breathtaking than other nationwide mandates like HHS's ban on evictions, the Labor Department's vaccine mandate, the Education Department's student-loan forgiveness, and the EPA's restructuring of the energy grid. So "[o]nly Congress can make this definitional change." *Texas v. Cardona*, 2024 WL 3658767, at *40.

Congress "has consistently rejected proposals" to expand Title IX to add gender identity. *Tennessee v. Becerra*, 2024 WL 3283887, at *1 (noting "the absence of Congressional action"); *Neese v. Becerra*, No. 2:21-cv-00163, 2022 WL 1265925, at *13 (N.D. Tex. Apr. 26, 2022) ("Legislators tried to amend Title IX to include … 'gender identity' on multiple occasions, but those attempts failed."); *see also, e.g.*, Equality

---

[1] Ctrs. for Medicare & Medicaid Servs., HHS, National Health Expenditures 2022 Highlights 3, https://www.cms.gov/files/document/highlights.pdf (Dec. 12, 2023).

Act, H.R. 5, 117 Cong. § 9(2) (2021); Title IX Take Responsibility Act of 2021, H.R. 5396, 117 Cong. As noted above, the ACA also speaks of sex and women's unique needs in a biological binary manner, so it does not clearly encompass this mandate.

### 2.   The rule lacks clear notice under the Spending Clause.

Congress must use "exceedingly clear language" to "significantly alter the balance between federal and state power," *Sackett v. EPA*, 598 U.S. 651, 679 (2023), or seeks to exercise Spending Clause authority, *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022). This "clarity requirement is a binding constitutional command," *Tennessee v. Becerra*, 2024 WL 3283887, at *8 (cleaned up), and imposes "a particularly strict standard." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990). "Unmistakably clear … language," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up), "must come directly from the statute," not a rule. *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021). This canon protects individuals, not just States. *Bond v. United States*, 564 U.S. 211, 222 (2011).

But Congress never, "with a 'clear voice,' adopted an ambiguous or evolving definition of 'sex' when it acted to promote educational opportunities for women in 1972." *Tennessee v. Becerra*, 2024 WL 3283887, at *13. Far from it. "Neither Title IX nor Section 1557 contain clear statements prohibiting discrimination on the basis of gender identity; they only refer to 'sex.'"*Id*. at *9. There is no serious argument that in 2010, much less in 1972, Congress unmistakably required anyone to provide or promote transition procedures. To the contrary, Section 1557 excludes from the scope of disability nondiscrimination requirements "transsexualism" and any "gender identity disorder" "not resulting from physical impairments." 29 U.S.C. § 705(20)(F)(i) (which Section 1557 incorporates). What is more, nothing in Section 1557 mandates using self-selected pronouns contrary to sex when the ACA itself references males and females as him and her. MCC thus "would have had no way of knowing that sex

discrimination would be interpreted" this way when it accepted federal funding and built its practice. *Tennessee v. Becerra*, 2024 WL 3283887, at \*9.

*Bostock* did not consider this "constitutional command" when it interpreted Title VII. *Tennessee v. Becerra*, 2024 WL 3283887, at \*8. In fact, *Bostock* admitted that "many, maybe most, applications of Title VII's sex provision were 'unanticipated'" and "unexpected." 590 U.S. at 679–80.

### 3.   Constitutional avoidance undermines the rule.

The rule raises constitutional concerns that this Court should avoid by construing the rule according to the ACA's longstanding public meaning. *See* Compl. [ECF 1] ¶¶ 281–323 (setting forth the rule's free-speech and federalism violations). When an act is subject to "competing plausible interpretations," *Clark v. Martinez*, 543 U.S. 371, 381 (2005), the statute must be construed "to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score," *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (cleaned up).

## III.   The rule should be vacated.

This Court should grant "the remedy an APA violation call[s] for—vacatur of the … [r]ule's [provisions addressing] 'gender identity.'" *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374 (5th Cir. 2022). "Vacatur [under Section 706] is the only statutorily prescribed remedy for a successful APA challenge." *Id.* at 374–75.

Vacatur wipes out the rule as such; it does not just apply to the parties in a case. *Career Colleges & Sch. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024); *Braidwood Mgmt.*, 104 F.4th at 951–52. When "'regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Tennessee v. Becerra*, 2024 WL 3283887, at \*13 (citing *Career Colleges & Schs. of Tex.*, 98 F.4th at 255). That's because the APA "empower[s] the judiciary to act directly against the challenged agency action" *in rem*.

20

*Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., statement respecting the denial of application)). Unlike an injunction, which operates *in personam* by directing officials not to enforce a mandate, vacatur operates against the agency action *in rem*—so vacatur "cannot reasonably depend on the specific party before the court." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2469 (2024) (Kavanaugh, J., concurring). That is why Section 706 is not party-restricted, *Tennessee v. Becerra*, 2024 WL 3283887, at *13, and why vacatur is inherently universal, *Texas v. DOT*, No. 5:23-CV-304, 2024 WL 1337375, at *20–*21 (N.D. Tex. March 27, 2024). "To vacate is to void." *Id.* at *21. HHS has elsewhere conceded that the APA's remedy is universal vacatur. *E.g.*, *Tice-Harouff v. Johnson*, No. 6:22-cv-201 (E.D. Tex. Dec. 6, 2022), ECF No. 38; *Facing Foster Care in Alaska v. HHS*, No. 1:21-cv-308 (D.D.C. June 29, 2022), ECF No. 44.

Vacatur ensures relief for MCC, similar clinics, and hospitals that partner with them. *Fed'n of Ams. for Consumer Choice, Inc. v. U.S. Dep't of Lab.*, No. 6:24-cv-163, 2024 WL 3554879, at *17 (E.D. Tex. July 25, 2024).

## IV.   MCC meets the factors for permanent injunctive relief.

The rule exceeds HHS's statutory authority, and so vacatur is appropriate without consideration of equitable factors. *Braidwood Mgmt.*, 104 F.4th at 951–52.

But MCC also meets the equitable factors for permanent injunctive relief.

### A.   MCC faces irreparable harm.

MCC faces irreparable harm without permanent relief. *First*, the rule forces MCC to perform or refer for transition procedures, self-censor, use self-selected pronouns, and remove its "Breastfeeding Moms Only" signs so men can enter its lactation rooms. *Supra* Pt.I.A. These harms to patients cannot be undone. *Second*, the rule imposes unrecoverable economic loss "so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,

875 F.2d 1174, 1179 (5th Cir. 1989). Permanent relief will ensure that clinics like MCC do not either lose all Medicaid and CHIP funding, *Texas v. Becerra*, 2024 WL 3297147, at *9, or suffer compliance costs, *Tennessee, v. Becerra* 2024 WL 3283887, at *10. HHS's sovereign immunity prevents recovery of these compliance costs. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024).

These injuries are not negated by a "vague footnote" in the rule's preamble, where HHS cites an HHS appeal of a pending class action against an earlier HHS policy, *Neese*, 640 F. Supp. 3d 668, *appeal docketed* No. 23-10078 (5th Cir. Jan. 25, 2024). *Tennessee v. Becerra*, 2024 WL 3283887, at *11–*12 (citing 89 FR at 37574 n.118). *Neese* did not issue any injunction, and it is not clear that MCC is in the *Neese* class. Plus, this footnote is "cold comfort" when HHS spends hundreds of pages in the *Federal Register* and in formal regulatory text insisting that regulated clinics must comply with its mandates. *Id*. at *12. "Administrative agencies … no less than Congress, do not hide elephants in mouseholes." *Id*. (cleaned up). In short, nothing "explicitly relieve[s]" MCC "from compliance" or "costs." *Id*. at *11–*12.

## B. The balance of equities and the public interest favor relief.

For many reasons, the balance of the equities and the public interest require equitable relief to ensure that clinics need not provide or promote transition efforts. *Tennessee v. Becerra*, 2024 WL 3283887, at *12–*13.

*First*, final relief would not harm HHS because HHS has no right to go beyond the law, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021), and any purported harms to HHS rest on "a clear misreading of the governing statutes," *Texas v. Becerra*, 2024 WL 3297147, at *11. There is "no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (cleaned up).

*Second*, any impact on HHS pales in comparison to the impact on MCC. *Tennessee v. Becerra*, 2024 WL 3283887, at *13. MCC must "either incur substantial

costs in order to implement" the rule "or lose federal funding." *Id*. at *12. No clinic should be shuttered or its patients abandoned just because the clinic wishes to help children instead of harming them. Artigues Decl. [ECF 1-2] ¶¶ 7–8.

*Third*, the public interest supports "maintaining our constitutional structure," giving state law its due. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618–19 (5th Cir. 2021). The rule preempts state laws protecting kids from unsafe procedures, irreparably harming States. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

*Fourth*, the rule will subject kids to transition procedures that will leave them with irreversible side effects—including sterilization—and life-long health risks.

It is impossible to change sex, and transition procedures lack a sound scientific basis. Decl. of James M. Cantor, Ph.D [ECF 6-1] ¶¶ 9–14, 38–75, 103–155, 298–342. There is no evidence that these experimental procedures improve mental health, *id*. ¶¶ 206–55, or reduce suicide or suicidality, *id*. ¶¶ 181–95. In fact, the best, most current evidence from large studies affirmatively shows *no* mental health improvement. *Id*. ¶¶ 125–28, 226–36.

Nor is there reliable evidence of effectiveness on minors' mental health when weighed against less risky treatments. *Id*. ¶¶ 220–55. Even "social transition" (such as using self-selected pronouns) is not associated with improvement in minors' mental health, *id*. ¶¶ 124–29. In fact, multiple international healthcare systems that had performed medicalized transition on minors reversed course based on strong evidence that there is no benefit and based on systematic reviews concluding that any evidence suggesting a benefit is of poor quality. *Id*. ¶¶ 17–37, 76–101.

Not only do transition procedures fail to improve mental health, they impose safety risks. *Id*. ¶¶ 256–97. The many harms associated with administering puberty blockers or cross-sex hormones to children and adolescents include: sterilization without proven fertility preservation options, permanent loss of capacity for breastfeeding, lifetime lack of orgasm and sexual function, interference with

neurodevelopment and cognitive development, substantially delayed puberty associated with medical harms, elevated risk of Parkinsonism in adult females, reduced bone density, lifetime dependance on hormone treatments, increased cardiovascular risk, and hormone-dependent cancers, among other effects. *Id.* ¶¶ 256–85. In particular, assertions that puberty blockers act only as a "fully reversible" "pause button" have no scientific basis and ignore widely recognized risks of permanent harm. *Id.* ¶¶ 286–97.[2]

Finally, complete relief requires an injunction ensuring that HHS does not impose its mandates under an alternate legal theory. HHS claims that even without the rule it could enforce its gender-identity mandates directly under Section 1557 or another law under various legal theories. *See, e.g.*, 89 FR at 37574; *Tennessee v. Becerra*, 2024 WL 3283887, at \*2. But any "statutory enforcement" of these mandates is just as unlawful as the rule, and so HHS should not be able to skirt an adverse judgment by switching to another legal theory.[3]

## CONCLUSION

The Court should thus grant partial summary judgment, vacate the rule's gender-identity mandates, and enjoin HHS from enforcing these mandates.

---

[2] *Cf.* Kamran Abbasi, *The Cass review: an opportunity to unite behind evidence informed care in gender medicine*, 385 Brit. Med. J. q837 (2024), https://www.bmj.com/content/385/bmj.q837.full.pdf ("Offering treatments without an adequate understanding of benefits and harms is unethical."); Kamran Abbasi, *"Medication is binary, but gender expressions are often not"—the Hilary Cass interview*, 385 Brit. Med. J. q794 (2024), https://www.bmj.com/content/385/bmj.q794.full.pdf ("The guidelines that recommend puberty blockers … are not based on the systematic review of the evidence. … I can't think of another area of paediatric care where we give young people a potentially irreversible treatment and have no idea what happens to them in adulthood.").

[3] This Court should waive any security requirement due to the strength of MCC's case and HHS's lack of financial harm. *Tennessee v. Becerra*, 2024 WL 3283887, at \*13.

Respectfully submitted this 15th day of August, 2024.

<table>
<tr><td></td><td><i>/s/ D. Michael Hurst, Jr.</i></td></tr>
</table>

**Matthew S. Bowman, PHV 60348**
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
mbowman@ADFlegal.org

**Julie Marie Blake, PHV 60378**
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

**D. Michael Hurst, Jr., MB 99990**
**Nash E. Gilmore, MB 105554**
**Phelps Dunbar LLP**
4270 I-55 North
Jackson, Mississippi 39211-6391
Telephone: (601) 352-2300
Facsimile: (601) 360-9777
mike.hurst@phelps.com
nash.gilmore@phelps.com

*Counsel for Plaintiffs McComb Children's Clinic, LTD.*